Filed 4/5/23  P. v. Michel CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DANIEL ANTHONY MICHEL,<br><br>    Defendant and Appellant. | D079571<br><br><br><br>(Super. Ct. No. 16CR031964) |

APPEAL from a judgment of the Superior Court of San Bernadino County, Ingrid Adamson Uhler, Judge.  Affirmed.

Sharon G. Wrubel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Susan Sullivan Pithey, Assistant Attorneys General, Idan Ivri and Wyatt E. Bloomfield, Deputy Attorneys General, for Plaintiff and Respondent.

Daniel Anthony Michel is currently incarcerated following his conviction for second degree murder.  He appeals the trial court's order

denying his petition for resentencing under Penal Code,[1] section 1172.6. Michel contends: (1) the trial court erroneously concluded that he was guilty of directly aiding and abetting a gang murder; and (2) his case is not final; therefore, Assembly Bill No. 333 applies and his gang enhancement under section 186.22, subdivision (b) and the vicarious firearm enhancements under section 12022.53, subdivisions (d) and (e) must be vacated because the offenses admitted into evidence to prove a pattern of criminal gang activity do not meet the requirements of Assembly Bill No. 333. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

We take the facts from this court's unpublished opinion, *People v. Michel*, D075390 (Jun. 5, 2019), in which we affirmed the judgment but remanded for the court to exercise its discretion to resentence Michel in light of certain statutory changes.

In 2017, a jury convicted Michel of second degree murder of Albert Pena (§ 187, subd. (a); count 1), and participating in a criminal street gang (§ 186.22, subd. (a); count 2). The jury also found true certain firearm enhancement allegations under section 12022.53, subdivisions (d) and (e), and an allegation that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). The court sentenced Michel to prison for 40 years to life, which includes 25 years to life for a firearm enhancement under section 12022.53, subdivisions (d) and (e).

Michel is a member of the Another Latin Crew (ALC) criminal street gang, which is led by Adrianna C. A gang expert described Adrianna as

---

[1] Undesignated statutory references are to the Penal Code. Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6 without substantive change. (Stats. 2022, ch. 58, § 10.) In this opinion we refer to section 1172.6, though the statute went by its former designation at the time of the proceedings.

"brazen" and violent, and testified that she is "an absolute terror on the city of Fontana and society due to her in-depth involvement in this gang." Adrianna's home serves as ALC headquarters.

Julio was the father of Adrianna's sister's child. Adrianna believed that Albert, a member of the rival Eastside Fontana gang, was the getaway car driver in Julio's killing and she ordered that he be killed. In June 2016, Adrianna herself unsuccessfully attempted to shoot Albert.

Ana M., who testified under a grant of immunity, is the mother of Michel's child. On July 5, 2016, Michel was a passenger in Ana's parked car on Reed Street when Albert drove by alone in his car. Michel told Ana to follow Albert. When alongside Albert's car, Michel challenged him to fight. Albert told Michel to follow him; however, when Albert drove into Eastside territory, Ana and Michel returned to Reed Street.

After Ana parked and exited her car, Albert also returned to Reed Street with a passenger, Robert C., an Eastside member. Robert reached into his waistband, indicating he had a gun. Michel told Ana that Robert was armed. Albert told Michel to follow him to a public park (the Park) to fight. Both ALC and Eastside claim the Park as their exclusive territory.

Ana and Michel drove to the northeast side of the Park, where they saw Albert and Robert standing outside Albert's car, apparently ready to fight. Believing that Robert was armed, Michel told Ana to drive to Adrianna's house to get some ALC members with guns. There, Adrianna directed three gang members—Brandon G., Miguel G. and Javier M.—to get in Ana's car.

Brandon had a .45-caliber semiautomatic handgun, along with gloves and a bandana to cover the gun. Brandon told Michel they would have to shoot before Robert and Albert could fire first. Ana drove Brandon, Miguel, and Javier to the Park's west side, about 500 yards from where Albert and

3

Robert were located. Before exiting Ana's car, Brandon chambered a round in the gun.

Ana and Michel drove to the Park's east side, where Albert and Robert were standing. Meanwhile, Brandon, Miguel and Javier were walking "like they were on a mission" towards the east side of the Park. About a minute later, Brandon, Miguel and Javier ran after Albert and Robert, who tried to run away. They were all running at full speed. Albert and Robert had no weapon in their hands. Brandon shot Albert in the buttocks and in the arm. As Albert lay bleeding and begging for his life, Miguel kicked him in the face. One shot damaged Albert's femoral artery, killing him.

Ana and Michel drove Brandon to Adrianna's house. Michel went to Miguel's house. There, Michel texted Ana, "The best knowing you got me like I got you" and "I swear you're the best."

Ana went to her best friend's (J.M.'s) house and told her what had happened. J.M. texted her boyfriend, "Crazy shit happened last night and her baby daddy and his crew killed someone and Ana was the getaway car."

A gang expert testified that because ALC and Eastside were in a heated rivalry, by fighting in the Park, a location both gangs claimed as their territory, it was reasonably foreseeable that a challenge to a fist fight could escalate to a shooting. He also testified that knowing one gang might have a gun, it would be "absolutely insane" for a rival gang member to show up without a firearm.

In Michel's first trial, the jury convicted him on count 2 (participating in a criminal street gang). But the jury hung on count 1 (murder), and therefore the court declared a mistrial on that count.

In the second trial, the court instructed the jury with CALCRIM No. 520 defining malice aforethought murder and with CALCRIM No. 521

4

regarding first degree murder. This latter instruction also stated that "second degree murder based on express or implied malice and/or the natural and probable consequence theories under both aiding and abetting and conspiracy are explained in CALCRIM No. 520 . . . and CALCRIM [Nos.] 403 and 417."

The court also instructed the jury with CALCRIM No. 400, explaining that a person may be guilty of a crime as a perpetrator or instead as an aider and abettor. This was followed by CALCRIM No. 401 on direct aiding and abetting.

Next, the court instructed the jury with CALCRIM No. 403 on second degree murder under the natural and probable consequences theory.

The court instructed the jury with CALCRIM No. 417 on conspiracy and the natural and probable consequences doctrine, which was consistent with CALCRIM No. 403 by stating that the jury could convict Michel of second degree murder if, among other required elements, second degree murder was a natural and probable consequence of the crime that he conspired to commit.

The court instructed the jury with CALCRIM No. 570 on voluntary manslaughter under a heat-of-passion theory.

In the second trial, the jury was unable to reach a verdict on first degree murder and asked for additional closing arguments. The court asked the jury to specify what it wanted each attorney to address. The jury stated that the prosecutor should address "[w]hat specific evidence shows [Michel's] decision to participate in the premeditation to commit murder" because "[a]ll of the testimony we have heard indicates [Michel] only wanted to fight. What actions indicate he was making a decision to kill?"

After additional closing arguments, the jury remained deadlocked on first degree murder. The People requested the court dismiss the first degree murder charge under section 1385, and have the jury continue deliberating on the remaining counts (second degree murder and voluntary manslaughter as lesser included offenses). The court granted that motion: "I think, potentially, [the jury is] having an issue emotionally, which I have obviously indicated they have to set that aside. But I think, emotionally, there's an issue because [Michel] is not the actual shooter . . . . He is young. There is an indication he never . . . 'got out of the car.' There's also an indication that the jurors are considering the fact that the getaway driver, his girlfriend, was not prosecuted and [instead] granted immunity."

The court informed the jury that "[f]irst degree murder no longer needs to be decided in this case" and "to continue your deliberations to determine whether or not the defendant is guilty of second degree murder, voluntary manslaughter, or not guilty." Thereafter, the jury found Michel guilty of second degree murder and found true the firearm and gang allegations.

*Resentencing Petition*

In 2019, Michel petitioned for resentencing under section 1172.6. The court set the matter for an evidentiary hearing, at which the parties presented no new evidence. Thereafter, it denied Michel's petition, finding the evidence proved beyond a reasonable doubt he was guilty of murder as a direct aider and abettor under current law: "For the record, the court has read and considered the defendant's petition for re-sentencing . . . , the response to the defendant's petition . . . , and I'm also taking judicial notice of the Court of Appeal's opinion, the Information, the jury instructions, partial transcript of the first and second trial, the preliminary hearing transcript, and the minute orders, and abstract of judgment . . .

6

"Finally, I am relying on my independent recollection of the testimony after being the trial court for two separate trials in this matter. Based upon fully examining all this information, I am denying the petition for resentencing . . . because the court is convinced beyond a reasonable doubt, after independently weighing the evidence that the defendant was [a] direct aider and abettor to the murder of Albert Pena and therefore not entitled to relief.

"Mr. Michel was an admitted member of the ALC gang, was the person who[ ] challenged Albert Pena—a rival gang member of the Eastside Fontana gang—to a fight at a park that both ALC and Eastside Fontana were fighting over for power and control. After seeing Albert Pena waiting, at the park, Michel told Ana, the [ ] mother of his child, to driven [sic] them to the 'ranch,' and a known ALC gang hang out to get some ALC member with guns.

"So [Michel] didn't go over to the ranch to get people. He actually went to the ranch to get known ALC gang members, one being armed. At the ranch Michel [got] out of the car, briefly spoke to people at the ranch. Now, my memory is hazy who he actually spoke to. I thought I remember the testimony saying he spoke to Adrianna. But I just don't have specific information as to that.

"Regardless, he spoke to people at the ranch. By his own admission [Michel] knew Adrianna was the shot caller and wanted Albert Pena to be killed in retaliation for a role—what they thought was his role as the getaway driver in the killing of Julio, Adrianna's sister's baby's father, and [Adrianna] even attempted to do so herself weeks before.

"Michel as the passenger and Ana as the driver then take Brandon—an ALC gang member—armed with a gun, along with gloves and a bandana to

7

cover the gun and two other ALC gang members, Miguel and Javier, back to the park to what becomes an ambush of Albert Pena.

"They drop off Brandon and the two other[s] on the opposite side of the park, drive toward Albert Pena, and engage verbally with Albert Pena, while both [Michel] and Ana remain in the car.  Meanwhile, Brandon, Julio . . . and Javier are walking through the park as if they were 'on a mission.'

"I believe the importance of [Michel] refusing to get out of the car indicates that he never had an intent to engage in a one-on-one fight with Albert Pena, but instead his intent was to aid and abet the murder of Albert Pena by keeping Albert Pena there while awaiting the arrival of the three gang members.

"During one portion of his interview with law enforcement—which he later contradicts—Michel's statement was he admitted he knew Brandon was armed with a semi-automatic handgun and he even heard him chamber a round before Brandon got out of the car at the park.  He also admitted that Brandon told Michel that he was going to 'light them up before they light me up.'  He later stated in the interview he didn't know anyone was armed and that Brandon and the others were there just to have his back if he was ambushed during his plan of a one-on-one fight with Albert Pena.  But the evidence previously outlined proves th[e] contrary to be true.

"After the shooting, Michel and his girlfriend drive Brandon away from the park back to Adrianna's house.  That was only after he witnessed the shooting and the other two gang members were kicking Albert Pena as he lay dying.  Michel stayed with Miguel while Ana stayed with her best friend J.M. After Ana told J.M. what happened, J.M. texted her boyfriend, quote, 'crazy shit happened last night and her baby daddy and his crew killed someone and Ana was the getaway driver.'  So even though the jury was instructed on

8

a natural, probable consequence theory, among other theories of murder, we do not know which theory of liability the jury relied on in finding the petitioner guilty of second degree murder.  That is not the issue in this hearing.

"The issue is whether the prosecution can show beyond a reasonable doubt that [Michel] is guilty of murder under the law effective after January 1st, 2019.  It is clear from these facts and the court is convinced beyond a reasonable doubt that [Michel] was a direct aider and abettor to the murder of Albert Pena and therefore he is ineligible for relief based upon the still valid theory of murder."

## DISCUSSION

### I.  *Sufficiency of the Evidence*

Michel contends insufficient evidence showed beyond a reasonable doubt that he shared the shooter's "murderous mindset and directly aided and abetted a gang hit, rather than that [his] decision to fight Albert one-on-one turned into a homicide he never intended."  He points to Ana's testimony that he did not want to fight but rather she wanted him to fight, the fact he was only 19 years old and of small stature, and his statements to police that his plan was just to fight.

### A.  *Applicable Law*

"As relevant here, Senate Bill [No.] 1437 significantly limited the scope of the felony-murder rule to effectuate the Legislature's declared intent 'to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' [Citations.]  . . .  [S]ection 189, as amended, now limits liability under a felony-murder theory principally to 'actual killer[s]' [citations] and those who,

9

'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were 'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of . . . [s]ection 190.2'—that is, the statute defining the felony-murder special circumstance." (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

"Senate Bill [No.] 1437 also created a special procedural mechanism for those convicted under the former law to seek retroactive relief under the law as amended." (*People v. Strong, supra*, 13 Cal.5th at p. 708.) Unless the parties stipulate that the defendant is eligible for resentencing, the court must "hold an evidentiary hearing at which the prosecution bears the burden of proving, 'beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under state law as amended by Senate Bill [No.] 1437. (§ 1172.6, subd. (d)(3).)" (*Strong*, at p. 709.) At the hearing, the court may consider previously-admitted evidence, so long as it remains "admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).) The parties may offer new or additional evidence to meet their respective burdens. " 'A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' [Citation.] 'If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' " (*Strong,* at p. 709.)

Second degree murder under a direct aiding and abetting theory "requires that 'the aider and abettor . . . know and share the murderous intent of the actual perpetrator.' [Citation.] For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' " (*People v. Gentile* (2020) 10 Cal.5th 830, 850.)

Section 188, subdivision (a)(3), "permits a second degree murder conviction only if the prosecution can prove the defendant acted with the accompanying mental state of mind of malice aforethought. The prosecution cannot 'impute[ ] [malice] to a person based solely on his or her participation in a crime.' " (*Gentile, supra*, 10 Cal.5th at p. 846, quoting § 188, subd. (a)(3).)

We review the trial court's factual findings for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*) We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical

11

inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

B. *Analysis*

Viewed in the light most favorable to the trial court's ruling, the totality of the evidence is sufficient to support its finding that Michel is guilty of second degree murder under current law. Michel admitted that he knew Brandon was armed with a semi-automatic .45-caliber handgun—he heard him chamber a round at the Park. Michel told police that he knew Brandon and his companions had "been wanting to" shoot Albert because Adrianna had "been wanting" Albert killed in retaliation for Albert's role in Julio's killing. Ana also told police that she knew gunfire could erupt. The gang expert testified that given the heated rivalry between ALC and Eastside, it was reasonably foreseeable that a fist fight could escalate to a shooting. The overwhelming evidence was that Albert's murder was the anticipated culmination of the escalating gang confrontations between ALC and Eastside. These facts all support the court's finding that Michel knowingly aided and abetted an implied malice murder. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599, review granted July 27, 2022, S274792.) ["It is well-settled that the presence at the scene of the crime and failure to prevent it, companionship and conduct before and after the offense, including flight, are relevant to determining whether a defendant aided and abetted in the commission of the crime"].)

Michel contends that despite the fact that two different juries failed to convict him of first degree murder, thus rejecting the conclusion that he "orchestrated the murder," the court, relying on the same evidence and arguments by the prosecution, erroneously found that he was guilty of aiding and abetting the murder. He relies on *People v. Cooper* (2022) 77 Cal.App.5th

393 (*Cooper*), claiming it "is instructive regarding a trial court's denial of a petition under section [1172.6] based on reliance on factual findings that a jury rejected at trial."

In *Cooper,* the jury acquitted the defendant of a charge of being a felon in possession of a firearm. (*Cooper, supra,* 77 Cal.App.5th at p. 397.) However, following his evidentiary hearing under section 1172.6, in which the parties did not submit any new or additional evidence, the court denied relief because it concluded the defendant had possessed and fired a gun, and therefore he was a major participant in the underlying kidnapping and acted with reckless indifference to human life under the amended section 189, subdivision (e)(3). (*Cooper,* at pp. 398, 416-417.) The court stated: "The acquittal establishes that the jury rejected [the prosecutor's] arguments and was not convinced beyond a reasonable doubt that [the defendant] possessed a firearm, much less fired one. Yet the trial court, also applying the reasonable-doubt standard and considering the same evidence . . . found that [the defendant] *did* possess and fire a firearm, and explicitly relied on this finding to determine he was a major participant. Thus, . . . the [trial] court effectively turned [the defendant']s acquittal 'into [its] opposite[ ].' " (*Cooper*, at p. 417.) The court remanded the matter for a new evidentiary hearing. (*Id.* at p. 418.)

Michel "recognizes that the two juries did not acquit [him] of first degree murder," but argues: "[T]hese juries rejected the prosecution's factual inferences and entire theory of the case, which the trial court accepted, nevertheless. Furthermore, on the prosecutor's motion, the court dismissed the charge of first degree murder during the second trial, when the prosecutor realized he could again, not get [*sic*] a first degree murder verdict."

13

We conclude *Cooper, supra,* 77 Cal.App.5th 393 is distinguishable on its facts. Here, the jury did not acquit Michel of a charge that the court later relied on to deny Michel relief on his resentencing petition. Rather, in the second trial, the court dismissed the first degree murder count and the jury convicted Michel of second degree murder. At resentencing, the court reviewed the entire record and independently concluded the evidence supported the second degree murder conviction under an aiding and abetting theory. Unlike in *Cooper*, the court's conclusion was not foreclosed by any jury finding.

## II. *Assembly Bill No. 333*

Michel contends that "because [his] case is not final, Assembly Bill No. 333 applies and requires striking the gang enhancement and vicarious firearm enhancement findings due to the failure to prove the required pattern of criminal gang activity." (Emphasis and some capitalization omitted.) The People respond: "Assembly Bill [No.] 333 does not apply retroactively to this case because appellant's judgment was final before [the bill] became effective, and merely obtaining an order to show cause under section 1172.6 does not reopen the judgment." (Emphasis and some capitalization omitted.)

### A. *Applicable Law*

In 2021, the Legislature passed Assembly Bill No. 333, which became effective on January 1, 2022. It amended section 186.22's definitions of "pattern of criminal activity" and "criminal street gang," and clarified what is required to show that an offense "benefit[s], promote[s], further[s], or assist[s]" a criminal street gang. (§ 186.22.) It also added section 1109, which addresses bifurcation of gang participation and enhancement charges. The California Supreme court has held that Assembly Bill No. 333 applies

14

retroactively under *In re Estrada* (1965) 63 Cal.2d 740 to *nonfinal* judgments. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206.)

The California Supreme Court has stated: "Under our precedent and the high court's, a judgment becomes final ' "where the judgment of conviction was rendered, the availability of appeal exhausted, and the time for petition for certiorari ha[s] elapsed." ' [Citations.] Once that process ends, the judgment may be challenged on collateral review. Merely filing a collateral attack does not make the judgment nonfinal." (*People v. Padilla* (2022) 13 Cal.5th 152, 162 (*Padilla*).)

In *Padilla*, a juvenile defendant was convicted of murder in adult criminal court and sentenced to life without the possibility of parole. (*Padilla, supra*, 13 Cal.5th at p. 159.) Several years later, he successfully petitioned for a writ of habeas corpus in light of *Miller v. Alabama* (2012) 567 U.S. 460, which held that mandatory life without parole sentences for juveniles violates the Eighth Amendment. (*Padilla*, at p. 159.) Two weeks after his sentence was vacated, the California electorate approved Proposition 57, which, among other things, requires that before a juvenile may be tried in adult court, the juvenile court must conduct a " 'transfer hearing.' " (*Padilla*, at p. 159; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303.)

The trial court subsequently resentenced the defendant to life without the possibility of parole. (*Padilla, supra*, 13 Cal.5th at p. 159.) On appeal from his resentencing, *Padilla* held the defendant was entitled to the retroactive application of Proposition 57, and thus, a transfer hearing. (*Padilla*, at p. 159.) The court observed it had already decided in *People v. Superior Court* (*Lara*), *supra*, 4 Cal.5th 299 that the *Estrada* presumption of retroactivity applies to the juvenile provisions of Proposition 57. (*Padilla*, at

p. 160; *In re Estrada, supra,* 63 Cal.2d 740.)  Thus, the issue before the court was whether his original judgment and sentence became "nonfinal when his sentence was vacated on habeas corpus." (*Padilla*, at p. 158.)  *Padilla* decided this issue in the affirmative, reasoning that when the defendant's sentence was vacated, the trial court regained the jurisdiction to impose a new sentence.  (*Id.* at pp. 161-162.)

B.  *Analysis*

This court affirmed the judgment on direct appeal in May 2019.  The California Supreme Court denied Michel's petition for review in September 2019.  The record does not indicate that he filed a petition for writ of certiorari in the United States Supreme Court.  Accordingly, the judgment has been final since 2019.  (See *People v. Lizarraga* (2020) 56 Cal.App.5th 201, 206 ["a petition for writ of certiorari is timely filed within 90 days after entry of judgment of a state court of last resort"].)

The mere fact Michel filed a petition for resentencing and the court held an evidentiary hearing under section 1172.6, subdivision (d)(3) did not reopen the judgment (*Padilla, supra,* 13 Cal.5th, at p. 162) because the judgment remains presumptively valid unless and until a court grants relief on his section 1172.6 petition, which the superior court declined to do.

*People v. Guillory* (2022) 82 Cal.App.5th 326 (*Guillory*) is instructive.  The defendant in that case filed a petition for resentencing under section 1172.6, contending she could not have been convicted of murder under the law as amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.)  (Stats. 2018, ch. 1015).  (*Guillory,* at p. 332.)  The trial court found the defendant made a prima facie showing and issued an order to show cause, but at the subsequent evidentiary hearing ruled she was not entitled to relief.  (*Ibid.*)  On appeal, the defendant contended she was entitled to the retroactive

application of Proposition 57, and thus, a transfer hearing. (*Guillory*, at p. 335.) The appellate court disagreed. Comparing the procedural posture of the defendant's matter to *Padilla*, *supra*, 13 Cal.5th 152, the court reasoned: "An order to show cause under section 1172.6 does not vacate the petitioner's sentence but, like the habeas petition in *Padilla*, sets in motion proceedings to determine whether the petitioner is entitled to vacatur and resentencing. (§ 1172.6, subd. (d)(1).) The original judgment remains final until that determination is made." (*Guillory*, at pp. 335-336.) The same analysis applies here. Michel's case was final, and as the court did not vacate his sentence, he is not eligible for relief under Assembly Bill No. 333.

DISPOSITION

The judgment is affirmed.


O'ROURKE, Acting P. J.

WE CONCUR:


IRION, J.


BUCHANAN, J.

17