Filed 11/20/24  In re Sessing CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| In re NATHAN GREGORY SESSING<br><br>on Habeas Corpus. | 2d Crim. No. B335270<br>(Super. Ct. No. 2005009634)<br>(Ventura County) |

In this petition for writ of habeas corpus, Nathan Gregory Sessing challenges the denial of his request for a second fitness hearing to determine whether a murder he committed in 2004 should be transferred from the jurisdiction of the juvenile court to adult criminal court.  He contends he is entitled to a new hearing because the record does not clearly indicate that the juvenile court would have transferred his case had it applied the provisions of Assembly Bill No. 2361 (2021-2022 Reg. Sess.) (Assembly Bill 2361) and Senate Bill No. 135 (2023-2024 Reg. Sess.) (Senate Bill 135) at his first fitness hearing in 2020.  We disagree, and deny the writ petition.

## FACTUAL AND PROCEDURAL HISTORY
*The underlying crimes*

In 2003, Sessing—then 16 years old—burglarized the house of one of his neighbors, Larry Phifer. (*People v. Sessing* (July 2, 2008, B193895) [nonpub. opn.] 2008 WL 2600721 at p. *1 (*Sessing I*).) More than a year later, Sessing broke into Phifer's house again, beat him with a baseball bat, and stabbed him multiple times. (*Id.* at p. *2.) Phifer died from a combination of blunt force trauma to the head and stab wounds to the neck. (*Ibid.*) Sessing was two months shy of his 18th birthday at the time. (*Id.* at p. *3.)

A jury convicted Sessing of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subd. (a)) and two counts of first degree residential burglary (Pen. Code, §§ 459, 460, subd. (a)).[1] (*Sessing I, supra*, 2008 WL 2600721 at p. *1.) The jury also found true allegations that Sessing personally used deadly weapons to murder Phifer (Pen. Code, § 12022, subd. (b)(1)) and that he committed the murder during a burglary (Pen. Code, § 190.2, subd. (a)(17)(G)). (*Sessing I*, at p. *1.) The trial court sentenced him to life in state prison without the possibility of parole plus nine years four months. (*Ibid.*) We affirmed the judgment on appeal. (*Id.* at p. *7.)

*Initial habeas proceedings*

In 2017, Sessing filed a petition for writ of habeas corpus in this court requesting resentencing pursuant to *Miller v. Alabama* (2012) 567 U.S. 460. (*People v. Sessing* (July 28, 2022, B314363) [nonpub. opn.] 2022 WL 2980561 at p. *1 (*Sessing II*).) We

---

[1] The jury also convicted Sessing of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)) for an unrelated incident. (*Sessing I, supra*, 2008 WL 2600721 at p. *1.)

ordered the Department of Corrections and Rehabilitation (CDCR) to show cause, in the trial court, as to why Sessing's request should not be granted. (*Ibid.*)

While resentencing was pending, Sessing filed another habeas petition, this one seeking a fitness hearing pursuant to Welfare and Institutions Code[2] section 707 and Proposition 57. (*Sessing II, supra*, 2022 WL 2980561 at p. *1.) The trial court granted the petition, conditionally reversed Sessing's convictions, and referred the matter to the juvenile court for the hearing. (*Ibid.*)

*The fitness hearing*

The juvenile court conducted Sessing's fitness hearing in March 2020. Sessing was 33 years old at the time. He testified that he started using methamphetamine at the age of 15, and continued to do so for the next two years. He also abused alcohol. He flunked out of high school and attempted suicide.

Sessing said he murdered Phifer in December 2004, when he was 17 years old. Afterward he tried to conceal his crime and hide his involvement. He asked others to do the same.

Sessing was sent to a maximum-security state prison when he was 19 years old. He was quickly introduced to the power structures and racial politics of the prison, and learned that if he tried to defy the system he would be targeted for assault. He said he and another prisoner stabbed a fellow inmate shortly after he began his sentence.

Sessing moved into protective custody in 2009. There, he began practicing a religion that focuses on how one's actions affect their spiritual value. Sessing reflected on his crime and

---

[2] Unlabeled statutory references are to the Welfare and Institutions Code.

3

realized that he needed to accept that he had committed a "terrible murder." In an attempt to make amends, Sessing wrote letters to Phifer's family and apologized for what he had done.

While in protective custody, Sessing spent much of his time in the library. He earned his GED and dozens of credits toward his associate's degree.

A clinical psychologist also testified at the fitness hearing. She said brain development is not complete until age 25 or 26. The last area to fully develop is the frontal lobe, which is responsible for "planning, organization, learning from past experiences . . . , time management, [and] thinking ahead." This stage is also when people develop impulse control.

The psychologist met with Sessing three times. In learning about Sessing's history she identified several adverse childhood experiences that disrupted his development: a near-death experience at two years old, his father's angry outbursts and frequent physical abuse, and his sister's chronic medical condition. The psychologist also administered several clinical tests and found that Sessing's score on the trauma inventory was elevated. She found Sessing's answers honest and accurate. He displayed traits of empathy and showed no signs of an antisocial personality.

The psychologist said that Sessing's childhood experiences were all "relevant to how he ended up engaging in the . . . behaviors that he . . . did during the time leading up to his arrest." He had "strong regret" about his past behavior. He had "matured" and "accepted responsibility" for his actions.

The psychologist opined that Sessing's behavior during the murder did not show sophistication. He was not developmentally capable of planning a sophisticated crime, and many of his

4

actions were inconsistent with someone who had experience in criminality. Additionally, the lies he told and his refusal to take responsibility for his actions were behaviors "expected or . . . anticipated from an adolescent who is in trouble." Sessing's drug use also likely contributed to his crime.

The psychologist opined that Sessing could be rehabilitated. He had exhibited "multiple prosocial and positive behaviors . . . fairly consistently for a number of years," which showed that he wanted to better himself. In her opinion, Sessing should be treated as a juvenile for purposes of this case.

*The juvenile court's transfer decision*

In making its transfer decision, the juvenile court said that the "primary issue" before it was to determine whether the murder Sessing committed "should have been handled in the juvenile court process and, in making that determination, whether or not his rehabilitation could have been done within the time limit that the . . . court would have" had jurisdiction over him. To decide that issue, the court considered the testimony presented at the fitness hearing and reviewed the probation report, the documents submitted by Sessing, his letters of support, and the clinical psychologist's report.

With respect to Sessing's degree of criminal sophistication, the juvenile court pointed out that Sessing had "knowledge of the criminal court process." He tried to convince people to act as alibis and testify falsify in his defense. Such circumstances showed a level of sophistication.

As to his prior delinquency history and prior attempts at rehabilitation, the juvenile court acknowledged that Sessing's prior crimes were "not of a very serious nature," thus "there was not much time for him to be offered rehabilitative services."

5

Regarding the circumstances and gravity of the offense, the court said that Sessing "showed some significant violent conduct when he not only stabbed but also hit Mr. Phifer with a baseball bat repeated times." The court found that Sessing's development "was apparently on par." He had some issues—many of which might be linked to substance abuse—but there were no indications of posttraumatic stress disorder or antisocial behaviors that might mitigate his actions.

The "big factor" was whether Sessing could have been rehabilitated while the juvenile court retained jurisdiction over him—a factor that required the court to "look[] backward instead of forward" given that Sessing was then 33 years old. Sessing accrued several rules violations while in a juvenile facility and in county jail between December 2004 and September 2006. He accrued more while in prison. He manipulated his programming. He resisted his family's efforts to help him address his substance abuse issues. And though he "expressed great remorse" and had begun to take responsibility for his actions, "his rehabilitation had not been reached by the time" the court's jurisdiction would have expired; his strides toward rehabilitation "certainly went . . . way beyond his age of 25 or 26." This showed that Sessing would not have been amenable to the juvenile court process. The court accordingly found, by a preponderance of the evidence, that Sessing's case should be transferred to adult criminal court, and reinstated his convictions.

*Subsequent proceedings*

After Sessing's challenges to the juvenile court's transfer decision were all denied, the trial court resentenced him to 25 years to life in state prison plus nine years four months. (*Sessing*

6

*II, supra*, 2022 WL 2980561 at p. *1.)  We dismissed the appeal of Sessing's new sentence.  (*Id.* at p. *3.)

Before the matter was final on appeal, Sessing filed a habeas petition seeking a new fitness hearing pursuant to Assembly Bill 2361.  Sessing argued that the bill's ameliorative changes to section 707 apply retroactively and that he would not have been transferred to criminal court had the changes been applied at his 2020 fitness hearing.  The trial court denied the petition, finding no possibility that Sessing would have remained under the juvenile court's jurisdiction even if the court had applied Assembly Bill 2361's standards.

We summarily denied the habeas petition Sessing subsequently filed with this court, citing *In re S.S.* (2023) 89 Cal.App.5th 1277, 1289 (*S.S.*).  The Supreme Court then granted Sessing's petition for review and transferred the matter back to us, ordering us to vacate our summary denial and issue an order to show cause as to why Sessing should not be granted the relief sought in his petition.

DISCUSSION

*Legal framework*

When prosecutors allege that a minor 16 years of age or older has committed a felony, they may request a fitness hearing to determine whether the minor should be transferred from the jurisdiction of the juvenile court to the jurisdiction of the adult criminal court.  (§ 707, subd. (a)(1).)  Before the juvenile court can grant such a request, prosecutors must prove "that the minor is not amenable to rehabilitation while under the jurisdiction of the juvenile court."  (§ 707, subd. (a)(3); Cal. Rules of Court, rule 5.770(a).)  This requires the court to consider: (1) the minor's "degree of criminal sophistication," (2) "[w]hether the minor can

7

be rehabilitated prior to the expiration of the juvenile court's jurisdiction," (3) "[t]he minor's previous delinquent history," (4) the "[s]uccess of previous attempts by the juvenile court to rehabilitate the minor," and (5) "[t]he circumstances and gravity of the offense alleged . . . to have been committed by the minor." (§ 707, subd. (a)(3)(A)-(E).)

Effective January 1, 2023, Assembly Bill 2361 amended section 707 in two ways relevant here. First, the bill raised the burden of proof at the fitness hearing from a preponderance of the evidence to clear and convincing evidence. (*In re E.P.* (2023) 89 Cal.App.5th 409, 416 (*E.P.*); see Stats. 2022, ch. 330, § 1.) Second, under the prior version of section 707, "whether the minor is amenable to rehabilitation while under the jurisdiction of the juvenile court was one of five factors for the court to consider in determining whether the case should be transferred to criminal court." (*E.P.*, at p. 416.) Now amenability to rehabilitation is "the ultimate question for the court to decide." (*Ibid.*)

The length of time a person can remain under the juvenile court's jurisdiction has also recently changed. Previously, the court retained jurisdiction over a person until they reached age 25, or for a period of two years from the date of their commitment to a secure youth treatment facility, whichever occurred later. (See former § 607, subds. (a)-(c).) Effective September 13, 2023, Senate Bill 135 permits the court to "retain jurisdiction over a person who is 25 years of age or older for a period not to exceed two years from the date of disposition." (§ 607, subd. (d); see Stats. 2023, ch. 190, § 12.)

*Assembly Bill 2361 retroactively applies to Sessing's case;*
*Senate Bill 135 does not*

We filed our decision in *Sessing II* on July 28, 2022. The Supreme Court denied review of our decision on October 12 of that year. Sessing's case thus became final on January 10, 2023. (*People v. Vieira* (2005) 35 Cal.4th 264, 306 [judgment becomes final when time to file petition for writ of certiorari has elapsed]; U.S. Supreme Ct. Rules, rule 13 [petition for writ of certiorari must be filed within 90 days of entry of judgment in state court of last resort].)

Because Sessing's case was not yet final when Assembly Bill 2361's amendments to section 707 took effect, it retroactively applies here. (*E.P.*, *supra*, 89 Cal.App.5th at p. 416.) Sessing's case had been final for some eight months when Senate Bill 135 took effect, however. Sessing nevertheless argues we should apply the bill because it added a retroactivity provision to section 607: "The amendments to this section made by [Senate Bill 135] apply retroactively." (§ 607, subd. (m).)

"We review questions of retroactivity de novo." (*In re A.M.* (2024) 102 Cal.App.5th 557, 565.) "Our fundamental task is to ascertain the Legislature's intent when it" added subdivision (m) to section 607. (*In re R.G.* (2019) 35 Cal.App.5th 141, 146.) "We begin with the . . . words [of the subdivision], giving them their plain, commonsense meanings." (*Ibid.*) "We construe [those] words in [the] context of related statutes, harmonizing them whenever possible." (*Ibid.*) "We presume the Legislature 'was aware of existing related laws' when it enacted [the subdivision], and that it 'intended to maintain a consistent body of rules.' " (*Ibid.*) "We also presume the Legislature was aware of judicial construction of those laws and that it intended the same

9

construction to apply to related laws with identical or substantially similar language." (*Ibid.*)

"If the meaning[] of [section 607, subdivision (m) is] unclear, we may examine [its] legislative history to determine the Legislature's intent." (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2019) 42 Cal.App.5th 148, 154, aff'd (2021) 12 Cal.5th 493.) "We may also 'consider the impact of an interpretation on public policy' and the consequences that may flow from it." (*Id.* at pp. 154-155.) But we will not "rewrite [the subdivision] to conform to an assumed intent that does not appear from [its] language." (*Id.* at p. 155.)

The meaning of "apply retroactively" in subdivision (m) of section 607 is susceptible to two interpretations: (1) that it applies retroactively to nonfinal cases, or (2) that it applies retroactively to all cases, regardless of their finality. We conclude the former interpretation is correct.

Pursuant to section 607, subdivision (d), a juvenile court may retain jurisdiction over a person older than age 25 years if the person committed an offense listed in section 707. Section 707's framework has largely been in place since 2016, when the electorate adopted Proposition 57. (See *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 305.) The Legislature has amended section 707 various times since then, including twice prior to the adoption of Senate Bill 135: when it adopted Senate Bill No. 1391 (2017-2018 Reg. Sess.) (Senate Bill 1391) in 2018, and when it adopted Assembly Bill 2361 four years later.[3] All of these enactments were held to apply retroactively to *nonfinal* cases

---

[3] Senate Bill No. 545 (2023-2024 Reg. Sess.) has also amended section 707, but the Legislature adopted this bill after the effective date of Senate Bill 135.

10

prior to the adoption of Senate Bill 135. (*Lara*, at p. 309 [Prop. 57]; *E.P.*, *supra*, 89 Cal.App.5th at p. 416 [Assem. Bill 2361]; *People v. Hwang* (2021) 60 Cal.App.5th 358, 365 [Sen. Bill 1391].) We presume the Legislature intended for Senate Bill 135 to apply in a consistent manner.

Senate Bill 135's legislative history reinforces this conclusion. When Senate Bill 135 was being considered, a Senate Rules Committee analysis stated that the bill would expand the juvenile court's jurisdiction in matters that "may arise due to resentencing efforts." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business, Analysis of Sen. Bill No. 135 (2023-2024 Reg. Sess.) as amended Aug. 28, 2023, p. 3.) But resentencing does not occur until *after* a petition for writ of habeas corpus is granted, at which point the judgment has become nonfinal. (*People v. Padilla* (2022) 13 Cal.5th 152, 161-162 (*Padilla*).)

Interpreting Senate Bill 135 as applying only to nonfinal cases promotes the strong public policy of "preserving the finality of judgments." (*People v. Hernandez* (2003) 30 Cal.4th 1, 8.) It also permits us to avoid wading into the constitutional thicket of determining whether the Legislature has the power to retroactively reopen otherwise final judgments. (Compare, e.g., *Padilla*, *supra*, 13 Cal.5th at p. 161 [approving of certain laws that "alter indisputably final cases"] with *People v. King* (2002) 27 Cal.4th 29, 34-36 [disapproving of another such law].) We therefore conclude the Legislature intended that the phrase "apply retroactively" in Senate Bill 135 means that the bill's provisions apply retroactively only to nonfinal cases. Because "[m]erely filing a collateral attack" (*Padilla*, at p. 162)—or even the issuance of an order to show cause (*People v. Guillory* (2022)

11

82 Cal.App.5th 326, 335-336)—"does not make the judgment nonfinal" (*Padilla*, at p. 162), Sessing is not entitled to the retroactive application of Senate Bill 135 here.

*The juvenile court would have reached the same transfer decision had it applied Assembly Bill 2361 at the 2020 fitness hearing*

" ' "[Minors] are entitled to [transfer] decisions made in the exercise of the 'informed discretion' of the [juvenile] court. [Citations.]  A court [that] is unaware of the scope of its discretionary powers can no more exercise that 'informed discretion' than one whose [transfer decision] is or may have been based on misinformation regarding a material aspect of a [minor]'s record."  [Citation.]  In such circumstances . . . the appropriate remedy is to remand for [a new fitness hearing] unless the record "clearly indicate[s]" that the [juvenile] court would have reached the same conclusion "even if it had been aware that it had such discretion." ' " (*People v. Salazar* (2023) 15 Cal.5th 416, 424; see also *In re J.M.* (2024) 103 Cal.App.5th 745, 753 [applying *Salazar* standard], review granted Sept. 25, 2024, S286259.)

The record here clearly indicates that the juvenile court would have ordered Sessing's case transferred to adult criminal court even if it had applied the provisions of Assembly Bill 2361 at the March 2020 fitness hearing.  At that hearing the court applied a standard of proof lower than the clear-and-convincing-evidence standard the law currently demands.  " 'The standard of proof known as clear and convincing evidence demands a degree of certainty greater than that involved with the preponderance standard, but less than what is required by the standard of proof beyond a reasonable doubt.' " (*S.S.*, *supra*, 89 Cal.App.5th at p. 1286.)  It requires " 'a finding of high probability[,]' " " 'that the

evidence be " 'so clear as to leave no substantial doubt' " ' " and " ' " 'sufficiently strong to command the unhesitating assent of every reasonable mind.' " ' " (*Ibid.*)

Our review of the juvenile court's transfer decision commands such unhesitating assent. When making its decision, the court properly considered the criteria set forth in subdivision (a)(3) of section 707. It concluded that some criteria did not weigh heavily in favor of transferring Sessing to criminal court: The crimes he committed before Phifer's murder were "not of a very serious nature" (§ 707, subd. (a)(3)(C)), and he had little experience with rehabilitative services (*id.*, subd. (a)(3)(D)). The court also noted, however, that Sessing was criminally sophisticated (*id.*, subd. (a)(3)(A)) and that his murder involved a high degree of inexcusable violence (*id.*, subd. (a)(3)(E)), which weighed in favor of transferring jurisdiction.

The court focused most of its attention on the fifth criterion set forth in subdivision (a)(3)—whether Sessing could be rehabilitated while it retained jurisdiction over him (§ 707, subd. (a)(3)(B))—calling it the "primary issue" and "big factor" in the case. The court noted that Sessing had made little progress toward rehabilitation during the first few years after Phifer's murder, the years during which the court would have retained jurisdiction over him. The court also noted that Sessing started to make positive strides in his mid-20s, earning his GED and several college credits, starting a creative writing program, taking victim awareness classes, and participating in Alcoholics Anonymous and Narcotics Anonymous. He had also "expressed great remorse" for Phifer's murder. But this "process of rehabilitation" occurred "beyond his age of 25 or 26," after the court would have lost jurisdiction over Sessing under the former

13

version of section 607.  The juvenile court thus concluded that this criterion weighed heavily in favor of transfer.

Since Assembly Bill 2361's enactment, whether a minor is amenable to rehabilitation while under the juvenile court's jurisdiction is the "ultimate question for the court to decide." (*E.P., supra*, 89 Cal.App.5th at p. 416.)  The court below answered this question in the negative.  Given the court's focus on this question and the evidence adduced at the fitness hearing, we conclude that the record clearly indicates the court would do so again were it to apply the clear-and-convincing-evidence standard of proof.

CDCR contends we should eschew the "clearly indicates" standard of prejudice and apply the "reasonably probable" standard set forth in *People v. Watson* (1956) 46 Cal.2d 818 instead because both the pre- and post-Assembly Bill 2361 versions of section 707 have required juvenile courts to evaluate the same five criteria to decide whether the minor would be amenable to treatment in the juvenile court system.  (Citing *In re Miguel R.* (2024) 100 Cal.App.5th 152, 170-171; *S.S., supra*, 89 Cal.App.5th at p. 1289.)  But treating a minor's amenability to rehabilitation as the "ultimate question for the court to decide" (*E.P., supra*, 89 Cal.App.5th at p. 416) requires a different exercise of discretion than treating it as one of five criteria. Indeed, in *E.P.* the juvenile court found the minor amenable to rehabilitation but nevertheless ordered his transfer to criminal court.  (*Id.* at pp. 413-414.)  The issue is academic here, however, because we would reach the same conclusion if we were to apply *Watson*.

14

## DISPOSITION

The petition for writ of habeas corpus is denied.

<u>NOT TO BE PUBLISHED.</u>


BALTODANO, J.


We concur:



GILBERT, P. J.



YEGAN, J.


15

Ryan J. Wright, Judge

Superior Court County of Ventura

_____

Olivia Meme, under appointment by the Court of Appeal, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Scott A. Taryle and Chung L. Mar, Deputy Attorneys General, for Respondent.